*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★　★　★  ★　★　★

# OPINION

No. 04-08-00078-CV

Zoila V. **LONGORIA**, et al.,
Appellants

v.

Edward A. **LASATER**, et al.,
Appellees

From the 79th Judicial District Court, Brooks County, Texas
Trial Court No. 06-11-13737-CV
Honorable Richard C. Terrell, Judge Presiding

**OPINION ON APPELLANTS' AMENDED MOTION FOR REHEARING**

Opinion by:　　Phylis J. Speedlin, Justice

Sitting:　　　Catherine Stone, Justice
　　　　　　　Phylis J. Speedlin, Justice
　　　　　　　Steven C. Hilbig, Justice

Delivered and Filed:　April 8, 2009

AFFIRMED

　　　The amended motion for rehearing filed by appellants, Zoila V. Longoria, et al., is denied.

This court's opinion and judgment dated January 14, 2009, are withdrawn, and this opinion and

judgment are substituted. We substitute this opinion to clarify a statement in the opinion.

　　　This appeal arises from an ownership dispute over a 3/21 mineral interest that the appellants,

the heirs of Celso V. Ramirez (the "Ramirez Heirs"), contend was held in trust and should have been

distributed to them in 1950 by the trustees, Garland M. Lasater, and J.R. Scott, Jr.; instead, the 3/21 mineral interest was divided among the Lasater and Scott families, and subsequently passed down to their heirs who are the defendants, and appellees, in the underlying lawsuit (collectively, the "Lasater/Scott Heirs").[1] Based on our analysis set forth below, we affirm the judgment of the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

A summary of the factual and procedural background of this appeal is necessary to an understanding of the issues presented on appeal.

***The 1924 Partition Agreement and Decree***.    On May 31, 1924, an agreed partition decree (the "Partition Decree") was entered by the Brooks County District Court in a lawsuit styled *J.R. Scott, Jr., et al. v. Celso V. Ramirez, et al.*, involving the Encino del Poso Land Grant.  The Partition Decree partitioned 22,245 total acres in the Encino del Poso Grant into 31 shares, and conveyed those shares to various owners including members of the Scott, Lasater, Longoria, and Ramirez families.  The accompanying partition agreement referenced a boundary dispute and an acreage "shortage" that was thought to be fenced within the adjoining Coyote Ranch.  Share 31, a small triangular shaped tract consisting of 460 acres, represented the land that was presumably fenced inside the Coyote Ranch, and thus not in the actual possession of the grantees at the time of the Partition Decree.  Accordingly, Share 31 was "set aside to J.R. Scott, Jr., Ed C. Lasater and Eugenio V. Longoria,[2] **in trust** for Lois R. Scott and Cecile R. Hopper, Maria Rita V. Longoria, Celso V.

---

[1] The Smith family comprises another group of defendants whose interests are aligned with the Lasater/Scott Heirs.  The Smith defendants adopted the summary judgment motions filed by the Lasater/Scott Heirs.

[2] Eugenio V. Longoria is sometimes referred to as "Longorio" in the documents; there is no dispute that the references are to the same person.  We will refer to this person using the surname "Longoria" because that is how he is originally referred to in the Partition Decree.

Ramirez, Pedro Benavides and Ed. C. Lasater . . . ." (emphasis added) in the following proportions:

> 5/21 to Lois R. Scott and Cecile R. Hopper jointly
> 3/21 to Maria Rita V. Longoria
> 3/21 to Celso V. Ramirez
> 1/21 to Pedro Benavides
> 9/21 to Ed C. Lasater

The Partition Decree further provided, "[t]he said Trustees are hereby authorized and empowered to recover possession of said tract of land by suit, agreement or compromise . . . and upon the final recovery of said land, or any portion thereof, to . . . distribute the proceeds, or to divide the land among said beneficiaries in the above mentioned proportion."  The decree stated, "[i]t is further ordered by the court that this decree of partition shall have the **same force and effect as a full warranty deed** of conveyance, in favor of the party or parties to whom the share is set aside in this partition, **his or their heirs**, executors, administrators, or assigns,  . . . ." (emphasis added).

During the subsequent years, Celso Ramirez and the others having an interest in Share 31 executed several oil and gas leases involving Share 31; the leases refer to the Partition Decree and its language conveying Share 31 "in trust" for the six beneficiaries, but none of the lessors signed in the capacity of "beneficiary" but simply signed individually.  Celso Ramirez also conveyed his interest in Share 31 to his wife, who died intestate.  Celso Ramirez died in 1948 without a will.  During the ensuing years, some of his seven children conveyed away their interests in Share 31.

***The 1950 Lips Litigation & Lips Deed***.    In 1948, more than twenty years after the Partition Decree, several parties filed a trespass to try title suit against Charles S. Lips (the "Lips Litigation"), the owner of the Coyote Ranch, seeking to recover title to the 460 acres denoted as Share 31 in the 1924 Partition Decree, and to establish other, unrelated, disputed boundaries.  The plaintiffs in the Lips Litigation included, among others, J.R. Scott, Jr., individually and not as a "trustee" under the

Partition Decree, and Garland M. Lasater, individually.[3] None of Celso Ramirez's heirs were parties to the Lips Litigation.

The trial court heard the matter and concluded that the boundary line was located where Charles Lips alleged. In its June 22, 1950 judgment (the "Lips Judgment"), the court found that all of the disputed 460 acres (Share 31) were located within the Vargas and El Perdido Grants to which **Lips held good and perfect record title from the sovereignty of the soil**; the trial court alternatively found that Lips had established ownership through adverse possession of the disputed tract for more than 30 years. On the same date that the Lips Judgment was signed, the plaintiffs filed an amended petition adding as additional plaintiffs "J.R. Scott, Jr. and Eugenio Longorio, [in their capacity as] *surviving Trustees* for the benefit of" the six Share 31 beneficiaries named in the Partition Decree, including Celso Ramirez. Prior to the amended petition, Eugenio Longoria had not been a party to the Lips Litigation. This is the first mention of Celso Ramirez in the Lips Litigation. The Lips Judgment was filed with the Brooks County Clerk on June 26, 1950.

On the same date as the Lips Judgment, June 22, 1950, Charles Lips signed a Mineral Deed (the "Lips Deed") in which he deeded an undivided 185.7 acre interest in the minerals underlying the disputed 460-acre tract to J.R. Scott, Jr. and Garland M. Lasater "**in trust, for the use and benefit of J.R. Scott, Jr., and Eugenio Longorio, surviving Trustees <u>for the benefit of</u> . . . Celso V. Ramirez** [and the other five partition beneficiaries] . . . pursuant to final judgment entered on May 31, 1924 [the Partition Decree] . . . ; **and** [the Lips Litigation parties]." (emphasis added). Thus, Lips conveyed a 185.7-acre mineral interest in Share 31 to Scott and Lasater in trust for the

---

[3] One of the original "trustees" under the Partition Decree, Edward C. Lasater, passed away in 1930. His son, Garland M. Lasater, was a plaintiff in the Lips Litigation. He then passed away in 1994, and his son, Garland M. Lasater, Jr., is a defendant in the current case.

benefit of the six beneficiaries of the 1924 Partition Decree and the parties to the Lips Litigation. Although it was signed on June 22, 1950, the Lips Deed was not filed in the Brooks County deed records until February 10, 1951.

*The 1950 Trustees' Deed & Subsequent Oil and Gas Leases.* Approximately six months after the Lips Deed was signed, on December 14, 1950, J.R. Scott, Jr., and Garland M. Lasater signed a deed as trustees (the "Trustees' Deed") distributing the 185.7 mineral fee acres among a group of ten grantees who had been parties to the Lips Litigation, including Garland M. Lasater individually and other Lasater family members, J.R. Scott, Jr., as co-executor of the Estate of Lois Scott, and Eugenio Longoria individually and other Longoria family members. Neither the estate nor any heirs of Celso Ramirez were included in the Trustees' Deed. The Trustees' Deed was filed of record on February 10, 1951—the same day the Lips Deed was recorded.

During the 1990's, Shell Western E&P, Inc. obtained several oil and gas leases from the Lasater and Scott Heirs covering their interests in the 185.7 mineral acres conveyed under the Trustees' Deed. In 1993, the leases were pooled and became part of the Barbara S. Lips Gas Unit. Oil and gas has been continuously produced from the wells on the Barbara Lips Unit since 1993, and related royalties and lease bonuses have been received by the Lasater and Scott Heirs. The leases are a matter of public record.

*The 2006 Lawsuit.* On November 6, 2006, the heirs of Celso Ramirez sued the heirs of Lasater and Scott seeking to establish legal title to their interest in the 187.5 mineral fee acres. The Ramirez Heirs' position is that they are trying to "unify" title to the disputed mineral interest by recovering legal title to the 3/21 interest in the 187.5 mineral acres to which Celso Ramirez, and his heirs, have held beneficial title for decades. From their Original Petition through their Third

Amended Petition, the Ramirez Heirs have consistently pled that equitable title to the 3/21 mineral fee interest was granted to Celso Ramirez in the 1950 Lips Deed—through its express conveyance of the mineral fee interest "in trust" for the benefit of Celso Ramirez pursuant to the 1924 Partition Decree. Specifically, in their Third Amended Petition, the Ramirez Heirs alleged that the **1950 Lips Deed** is the "**common source of title**" between them and the Lasater/Scott Heirs in the 460-acre tract, and conclusively establishes Celso Ramirez's "superior equitable title" to 3/21st of the 187.5 mineral acres underlying the 460 surface acres.[4] They also alleged that J.R. Scott, Jr. and Garland M. Lasater (predecessors of the current defendants) breached their fiduciary duty and misapplied fiduciary property by taking for themselves and their families (via the 1950 Trustees' Deed) the mineral interest belonging to Celso Ramirez which Scott and Lasater held "in trust" for him under the 1950 Lips Deed; they further asserted that this constituted fraud. In addition to a judgment granting them legal title, the Ramirez Heirs sought an accounting and recovery of the oil and gas royalties and lease bonuses attributable to Celso Ramirez's mineral interest but received by the Lasater/Scott Heirs under the Shell leases. They also pled for exemplary damages based on intentional misappropriation of fiduciary property. Finally, in response to the defendants' assertion of a limitations bar, the Ramirez Heirs asserted the discovery rule based on "the fraudulent concealment in the 1950 Trustees' Deed." The Ramirez Heirs alleged that their first notice of any mineral interest in the 460-acre tract known as Share 31 arose when one of the Ramirez Heirs stumbled across her great-grandfather's name on one of the deeds while searching the Brooks County public records in the course of her employment in the county clerk's office.

---

[4] Celso Ramirez had seven children. The plaintiffs in this lawsuit, representing five families of descendants of the seven Ramirez children, allege they are the "vested title owners of an undivided 5/7ths of 1/7th [3/21] of 185.7/460.6ths of the oil, gas and other minerals in and under a tract of 460.6-acres of land situated in Brooks County, Texas . . . ."

The Lasater/Scott Heirs answered with a general denial and asserted the affirmative defenses of standing, res judicata, limitations, adverse possession and laches. They also asserted the absence of a fiduciary or "successor trustee" relationship, as well as the absence of any fraud or basis for exemplary damages. In addition, they counterclaimed for a declaratory judgment confirming their record title to the disputed mineral interests. Finally, in a supplemental answer, the Lasater/Scott Heirs asserted that the discovery rule does not apply to delay the running of limitations because there was no fraudulent concealment, and the plaintiffs' claims and alleged injuries were "inherently discoverable" since all the documents on which they rely have been on file in the public records for over 50 years.

### SUMMARY JUDGMENT MOTIONS

***Standard of Review***

When both parties move for summary judgment, and the trial court grants one motion and denies the other, the appellate court considers the summary judgment evidence presented by both sides, determines all questions presented, and, if it determines the trial court erred, renders the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We review the trial court's summary judgment *de novo*, regardless of whether the motion for summary judgment was a traditional motion or a no-evidence motion. *Valence*, 164 S.W.3d at 661; *Provident Life and Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Knott*, 128 S.W.3d at 215.

To be entitled to a traditional summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* at 215-16; TEX. R. CIV. P. 166a(c). A defendant moving for a traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action, or conclusively establish each element of an affirmative defense. *Long Distance Intern., Inc. v. Telefonos de Mexico, S.A. de C.V.*, 49 S.W.3d 347, 350-51 (Tex. 2001); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

A party is entitled to summary judgment on a no-evidence motion when there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003) (no-evidence summary judgment is essentially a pretrial directed verdict, and appellate court applies same legal sufficiency standard as for a directed verdict). If the respondent produces more than a scintilla of evidence establishing the existence of the challenged element, a genuine issue of material fact exists. *King Ranch*, 118 S.W.3d at 751. More than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.*

### Summary Judgment Motions Filed in This Case

Here, competing summary judgment motions were filed on the issue of title only. The Ramirez Heirs, plaintiffs, filed a partial motion for summary judgment based on the 1950 Lips Deed as the "common source of title," and as "evidenc[ing] the superior equitable title of Celso V. Ramirez and his heirs to an undivided one-seventh of 185.7/460.6ths of the oil, gas and other

minerals in and under Share 31, the identified 460.6-acre tract." The Lasater/Scott Heirs, defendants, jointly moved for both a no-evidence and a traditional summary judgment. They alleged there was "no evidence" the Ramirez Heirs ever had equitable or legal title to the disputed tract, "no evidence" that they (Lasater/Scott Heirs) or their predecessors had a fiduciary duty arising out of any trust or committed fraud or misapplied fiduciary property, and "no evidence" to support exemplary damages. In addition, the Lasater/Scott Heirs moved for a traditional summary judgment on title, asserting their evidence conclusively established as a matter of law that they had record title to the disputed property based on the 1950 Lips Deed, and that the Ramirez Heirs lacked standing because they had no equitable or legal title to the property. The Lasater/Scott Heirs further asserted the evidence conclusively established they were not fiduciaries or successor trustees, and did not commit fraud, misapply fiduciary property, or engage in conduct warranting exemplary damages. Finally, the Lasater/Scott Heirs moved for summary judgment on the grounds that the Ramirez Heirs' claims were barred by res judicata, limitations,[5] adverse possession, and laches. Both sides relied on basically the same documents for their summary judgment evidence, the majority of which have been filed in the public records for many years, and even decades.[6]

---

[5] The Lasater/Scott Heirs filed a supplemental summary judgment motion asserting that the discovery rule, as pled by the Ramirez Heirs, did not apply to toll the statute of limitations. The limitations bar was pled only as to the plaintiffs' claims for fraud, breach of fiduciary duty, and misapplication of fiduciary property.

[6] The Ramirez Heirs' summary judgment evidence consisted of: (1) affidavits of heirship; (2) the chain of title documents pertaining to the 460-acre tract (Share 31) and the 187.5 mineral acres – beginning with the 1924 Partition Decree, and including deeds among family members, the 1950 Lips Judgment, the 1950 Lips Deed and the 1950 Trustees' Deed, as well as several oil and gas leases executed on the 187.5 mineral acres over the years to the present day; and (3) the 1950 depositions of Garland Lasater and J.R. Scott, Jr. given during the Lips Litigation. The Lasater/Scott Heirs' summary judgment evidence contained: (1) affidavits by the individual defendants as to their personal knowledge, if any, about their predecessors' conduct, and the prior deeds and leases concerning the disputed tract; (2) the chain of title documents pertaining to the 460-acre tract and 185.7 mineral acres, plus numerous oil and gas leases executed throughout the ensuing 80-year period; and (3) the relevant court pleadings, depositions, and judgment in the 1950 Lips Litigation.

After a hearing, the trial court denied the Ramirez Heirs' partial motion for summary judgment on the issue of title, and granted both the no-evidence and traditional summary judgment motions filed by the Lasater/Scott Heirs. In its order, the court found there was no evidence of the following:

1. that Plaintiffs have held legal or equitable title to the disputed tract, described as Share No. 31 in the Partition Decree and as the Second Tract in the 1950 Lips Deed;
2. that a fiduciary duty concerning the disputed tract existed;
3. that there was a misapplication of fiduciary property as to the disputed tract;
4. that fraud occurred;
5. that would support an award of exemplary damages; and
6. there is no evidence that the discovery rule applies to toll the running of limitations.

The trial court also found that the Lasater/Scott Heir's summary judgment evidence conclusively established that:

1. Defendants hold perfect record title to the disputed tract;
2. Plaintiffs lack standing because they do not own any equitable or legal interest in the disputed tract;
3. Defendants are not successor trustees;
4. Plaintiffs' claims for fraud and breach of fiduciary duty are barred by limitations; and
5. Plaintiffs' claims are barred by laches.

The Ramirez Heirs appealed, challenging all the grounds on which the trial court granted the defendants' no-evidence and traditional motions, and the denial of their own partial summary judgment motion.

TRESPASS TO TRY TITLE CLAIM — THE DISPUTED 185.7 MINERAL ACRES

Since we have competing summary judgment motions on title, the ultimate issue in this appeal is who has superior title to the disputed 185.7 mineral acres. In resolving that question within the context of this appeal, we must review the summary judgment evidence to determine whether either the Lasater/Scott Heirs or the Ramirez Heirs conclusively established as a matter of law

through their summary judgment evidence that they hold superior equitable title or legal title to the 185.7 mineral acres, or whether there is a material fact issue concerning title. As noted, the trial court found that the Lasater/Scott Heirs proved they have "perfect record title" to the disputed property as a matter of law. The court further found the evidence conclusively established that the Ramirez Heirs do not own either "an equitable or legal interest" in the property, and thus they lack standing. Because both sides rely on the same documents to establish their claim of title, our analysis turns on an interpretation of the documents, and the application of summary judgment principles. In addition, we must determine whether the Lasater/Scott Heirs proved, as a matter of law, their affirmative defenses against the plaintiffs' other claims for fraud, breach of fiduciary duty, and misapplication of fiduciary property claims.

To analyze the title issue in this case, it is necessary to discuss the relevant types of property interests at play. "Perfect title" means fee simple title, or "a title that does not disclose a patent defect that may require a lawsuit to defend it . . . title that is good both at law and in equity." BLACK'S LAW DICTIONARY at 1523 (8th ed. 2004). "Record title" means title as it appears in the public records after the deed is properly recorded. *Id.* A person owns an "equitable interest" in property by virtue of "an equitable title or claim[] on equitable grounds, such as the interest held by a trust beneficiary." *Id.* at 829. On the other hand, a "legal interest" is "an interest recognized by law, such as legal title." *Id.* Finally, "equitable title" is "a title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title." *Id.* at 1523. "Legal title" is "a title that evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest." *Id.*

A suit to resolve a dispute over title to land is, in effect, a trespass to try title action regardless of the form the action takes and whether legal or equitable relief is sought. *Bell v. State Dep't of Highways & Pub. Transp.*, 945 S.W.2d 292, 294 (Tex. App.—Houston [1st Dist.] 1997, writ denied), *abrogated on other grounds*, 136 S.W.3d 635 (Tex. 2004). A trespass to try title action "is the method of *determining* title to lands." TEX. PROP. CODE ANN. § 22.001 (a) (Vernon 2000) (emphasis added).[7] To recover in a trespass to try title suit, the plaintiff has the burden to prove its title to the disputed property by: (1) a regular chain of conveyances from the sovereign; (2) a superior title out of a common source; or (3) prior possession that has not been abandoned. *Rogers v. Ricane Enterps., Inc.*, 884 S.W.2d 763, 768 (Tex. 1994). The plaintiff's claim must rest on the strength of its title, not a weakness in its opponent's title. *Id.* Proof of a common source of title may be made by the plaintiff through certified copies of the deeds showing a chain of title to the defendant emanating from and under such common source. TEX. R. CIV. P. 798. An owner of a superior equitable title may recover in a trespass to try title action if the record shows the equitable title is superior to the defendant's bare legal title. *See Binford v. Snyder*, 144 Tex. 134, 189 S.W.2d 471, 474 (Tex. 1945); *Morrison v. Parish*, 384 S.W.2d 764, 767 (Tex. Civ. App.—Texarkana 1964, writ dism'd w.o.j.).

Generally, the construction of a deed is a question of law. *Terrill v. Tuckness*, 985 S.W.2d 97, 101 (Tex. App.—San Antonio 1998, no pet.) (noting that rules of contract construction ordinarily apply to construction of a deed). This Court has described the process of interpretation of a deed as involving three tiers: (1) the court attempts to ascertain the grantor's intent by examining the plain

---

[7] ⬆ In contrast, "[a] suit to quiet title is an equitable action that involves *clearing* a title of an invalid charge against the title." *A.I.C. Mngmt. v. Crews*, No. 01-03-01178-CV, 2005 WL 267667, at *3 n.8 (Tex. App.—Houston [1st Dist.] Feb. 3, 2005), *reversed on other grounds*, 246 S.W.3d 640 (Tex. 2008).

language of the deed; (2) the court then applies the applicable rules of construction to the deed; and (3) the court then allows extrinsic evidence in to aid in the interpretation of the deed, if necessary. *Id.* at 102. The court only progresses to the next tier if the grantor's intent is still unclear. *Id.* Mere disagreement about the interpretation of a deed does not make a deed ambiguous; an instrument is ambiguous only if, after application of the rules of construction, it is unclear which meaning is the correct one. *Id.* One deed may not be used to create an ambiguity in, or to explain, another deed unless (1) the deeds are between the same parties; or (2) the party relying on the extrinsic deed can show the other party had knowledge of it. *Id.* at 104. Even where ambiguity is present, extrinsic evidence is admissible only to show the intent of the grantor at the time the deed was executed. *Id.* at 104 n.2.

### Construction of the 1950 Lips Deed — Grantor's Intent

Both sides claim the 1950 Lips Deed as the "common source" of their title to the 185.7 mineral acres; therefore, we begin our analysis there.[8] As detailed, *supra*, the plain language of the Lips Deed conveys to Garland M. Lasater and J.R. Scott, Jr. an undivided 185.7 acre interest in the minerals underlying the 460 acre tract "**in trust**, **for the use and benefit of J.R. Scott, Jr., and Eugenio Longoria, surviving Trustees for the benefit of**" the six partition beneficiaries (including Celso Ramirez) "pursuant to" the 1924 Partition Decree. The parties agree that the plain language of the Lips Deed is not ambiguous and conveyed the 185.7 mineral acres "in trust," and thus purported to create a trust for the benefit of Celso Ramirez and the other five original beneficiaries

---

[8] The Ramirez Heirs make some references in their briefing to the 1924 Partition Decree as the source of their equitable title, as well as the "common source of title." In their brief, the Lasater/Scott Heirs assert waiver, arguing that the Ramirez Heirs pled the 1950 Lips Deed as the "common source of title" in the trial court – both in their petition and their summary judgment motion. The record confirms that to be correct. At oral argument, both sides agreed that the 1950 Lips Deed is the "common source" of both sides' claim to title.

of the Partition Decree. They disagree on the validity and effect of the trust sought to be created by the Lips Deed.

The Ramirez Heirs contend the Lips Deed trust was a continuation of the original trust created by the 1924 Partition Decree, as evidenced by the Lips Deed's reference to the Partition Decree; therefore, the Lips Deed did not create a new trust. The Lasater/Scott Heirs, on the other hand, contend the Lips Deed sought to create a new trust which failed for several, alternative reasons. Their main argument is that because Celso Ramirez, through whom the Ramirez Heirs claim, died in 1948 and thus predeceased the creation of the Lips Deed trust in which he was an intended beneficiary, the Lips Deed trust failed as to Celso's 3/21 interest. As discussed below, we find this argument persuasive.

### *What is the Effect of Celso Ramirez's Death Before the 1950 Lips Deed?*

"To create a trust by a written instrument, the beneficiary, the *res*, and the trust purpose must be identified." *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, N.A.*, 748 S.W.2d 218, 220 (Tex. 1988); *Sarah v. Primarily Primates, Inc.*, 255 S.W.3d 132, 145 (Tex. App.— San Antonio 2008, pet. denied). In an express trust, a fiduciary relationship is created pursuant to which the trustee holds a property interest, subject to an equitable obligation to keep or use that interest for the benefit of another, *i.e.*, the beneficiary. TEX. PROP. CODE ANN. § 111.004(4) (Vernon Supp. 2008); *Morrison*, 384 S.W.2d at 766. To create a trust, the person intended to be the beneficiary must be identified with certainty. *Pickelner v. Adler*, 229 S.W.3d 516, 526 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). The existence of a beneficiary is an indispensable element of an express trust; in the absence of a beneficiary, "the effort to create such trust aborts." *Morrison*, 384 S.W.2d at 766 (unidentified beneficiary caused trust to fail); *Wortham v. Baxter*, 571 S.W.2d 539, 544 (Tex. Civ.

App.—Eastland 1978, writ ref'd n.r.e.) (trust never came into existence because the intended beneficiary predeceased the testatrix). Section 112, comment f, of the Restatement (Second) of Trusts expressly provides,

> A person who has died prior to the creation of a trust cannot be a beneficiary of the trust. Thus, if property is transferred inter vivos [*i.e.*, not by will] in trust for a named person who is dead at the time of the transfer, no trust is created.

RESTATEMENT (SECOND) OF TRUSTS §112 cmt. f (1959); *see* RESTATEMENT (THIRD) OF TRUSTS § 44, cmt. d (2003) (same).

In this case, it is undisputed that Celso Ramirez died in 1948, well before the Lips Deed was signed in 1950; therefore, under the applicable law no trust was created as to Celso's 3/21 interest in the 185.7 mineral acres conveyed in the Lips Deed.[9] As noted, the Ramirez Heirs argue on appeal that the Lips Deed did not create a "new" trust, but merely continued the original trust created by the 1924 Partition Decree. *See Binford*, 189 S.W.2d at 473 (when property already subject to a trust is conveyed by the trustee, outside the course of executing the terms of the trust, the transferee acquires the property subject to the same trust and himself becomes a trustee for the original beneficiary). We disagree. Whatever contingent interest in Share 31 (the 460 acres) was intended to be granted by the 1924 Partition Decree was never acquired by the trustees, as confirmed by the 1950 Lips Judgment. The Lips Judgment held that Charles Lips had perfect legal title to Share 31 (the 460 acres) back to the sovereign. Thus, as confirmed by the Lips Judgment, the 1924 Partition Decree never granted Celso Ramirez any title, either legal or equitable, to Share 31 because it was always located within the Coyote Ranch fences, and Lips had legal title, back to the sovereign, to all the land within the Coyote Ranch boundaries.

---

[9] We note that, in listing the beneficiaries of the trust, the Lips Deed does not include the heirs of Celso Ramirez, only Celso Ramirez himself.

The Ramirez Heirs also argue that the Lips Judgment cannot "relate back" to undermine the earlier Partition Decree which purported to have the effect of a full warranty deed as to the beneficiaries and their heirs. They argue the Lips Judgment only established that legal title to the surface of Share 31 was held by Lips back to the sovereign, and does not mean that Celso Ramirez did not acquire an equitable interest in Share 31 and its underlying minerals. The district court's finding in the Lips Judgment that Charles Lips held "perfect record title" contains no exceptions, is not limited to the surface, and does not exclude the underlying minerals. Furthermore, the Ramirez Heirs have never attempted to collaterally attack the Lips Judgment as void, and the Lips Judgment is thus presumed valid and binding. *See Stewart v. USA Custom Paint & Body Shop, Inc.*, 870 S.W.2d 18, 20 (Tex. 1994). Having rejected the arguments advanced by the Ramirez Heirs, we next consider the result of the failed Lips Deed trust as to Celso's 3/21 interest.

When an express trust fails, a resulting trust is generally implied in law. *Nolana Dev. Ass'n v. Corsi*, 682 S.W.2d 246, 248, 250 (Tex. 1984); *Pickelner*, 229 S.W.3d at 526 (when an express trust fails, "the law implies a resulting trust with the beneficial title vested in the trustor, or in the case of the trustor's death, in h[is] estate and devisees"); *Morrison,* 384 S.W.2d at 767 (same). When an intended beneficiary has died prior to the creation of the trust, "the transferee ordinarily holds upon a resulting trust for the transferor." RESTATEMENT (SECOND) OF TRUSTS § 112 cmt. f (1959); *see* RESTATEMENT (THIRD) OF TRUSTS § 44 cmt. d (2003) (same); *see also* RESTATEMENT (SECOND) OF TRUSTS § 411 ill. 3 (1959) (where A makes a transfer inter vivos of Blackacre to B in trust for C, and C is dead at the time of the transfer, B thus holds Blackacre upon a resulting trust for A). When an express trust fails *in part*, for example as to a fractional share of the trust property, a resulting trust arises as to the interest with respect to which the trust fails, unless the transferor

properly manifested an intent that no resulting trust should arise. RESTATEMENT (SECOND) OF TRUSTS § 411 cmt. h (1959); RESTATEMENT (THIRD) OF TRUSTS § 8 (2003).

The usual presumption of a resulting trust does not apply if the trustee has paid consideration to the transferor as an agreed exchange; in that situation, if the express trust fails and the trustee has paid consideration for the transfer as an agreed exchange, the trustee is allowed to retain the property free of any trust. *See Jordan v. Exxon Corp.*, 802 S.W.2d 880, 882 (Tex. App.—Texarkana 1991, no writ) (citing G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 468, at 812 (rev. 2d ed. 1977)); *see also* RESTATEMENT (SECOND) OF TRUSTS § 423 (1959); RESTATEMENT (THIRD) OF TRUSTS § 8 cmt. f (same). If, however, the consideration paid by the trustee is not intended by the parties as the full purchase price of the property, and an express trust has failed, then the parties have created the resulting trust jointly and a court must order an equitable disposition of the property in light of the circumstances, including the amounts contributed by each of the parties and the other rights, relationships, and general objectives of the parties. RESTATEMENT (THIRD) OF TRUSTS § 8 cmt. f; *see also* RESTATEMENT (SECOND) OF TRUSTS § 423 cmt. c.

Applying the law to the facts of this case, Lips was the grantor of the trust sought to be created by the Lips Deed, and, according to the deed recital, Lips received $10 consideration from the trustees, Lasater and Scott, in exchange for the conveyance of the 185.7 mineral acres. Thus, when the express trust failed at inception as to the 3/21 interest, due to Celso's prior death, the trustees (Lasater and Scott) either: (i) held that 3/21 interest free of any trust based on their payment of consideration in an agreed exchange with Lips; or (ii) held that 3/21 interest in a joint resulting trust with Lips – neither of which situations is of benefit to the Ramirez Heirs.

### *Conclusion as to Title*

We conclude that based on the summary judgment evidence, the Lasater/Scott Heirs conclusively established a clear chain of record title to the disputed 185.7 mineral acres—from the 1950 Lips Deed backward to the sovereign based on the Lips Judgment, and from the 1950 Lips Deed forward through the Trustees' Deed to the present day. Accordingly, we hold the trial court was correct in concluding that the Lasater/Scott Heirs proved "perfect record title" as a matter of law, and in granting their traditional summary judgment on that basis, and denying the Ramirez Heirs' partial summary judgment motion on their claim of title. We further hold that, based on the summary judgment record, the trial court was correct in finding the Ramirez Heirs have no equitable or legal interest in the disputed tract.

### FRAUD, BREACH OF FIDUCIARY DUTY & MISAPPLICATION OF FIDUCIARY PROPERTY

In addition to their title claim, the Ramirez Heirs also pled causes of action for fraud, breach of fiduciary duty, and misapplication of fiduciary property based on the distribution of the interests in the 185.7 mineral acres in the Trustees' Deed, which omitted Celso Ramirez's heirs. As previously noted, the trial court granted the Lasater/Scott Heirs' no-evidence summary judgment motion on those claims. Our conclusion, *supra*, that the summary judgment evidence conclusively proves that the Lasater/Scott Heirs hold perfect record title to the disputed interest, and that the Ramirez Heirs have no equitable or legal interest, negates any factual or legal basis for the Ramirez Heirs' claims of fraud, breach of fiduciary duty and misapplication of fiduciary property—as no fiduciary duty arose because the Ramirez Heirs have no interest in the 187.5 mineral acres, and the distribution of the 187.5 mineral acres in the Trustees' Deed therefore could not be fraudulent. Based on our review of the record, we concur with the trial court that there is "no evidence" in the

summary judgment record that a fiduciary duty related to the disputed tract existed, that there was a misapplication of fiduciary property, or that fraud occurred. Accordingly, we affirm the trial court's summary judgment in favor of the Lasater/Scott Heirs on those no-evidence grounds.

## CONCLUSION

Based on the foregoing reasons, we conclude the trial court properly granted traditional summary judgment in favor of the Lasater/Scott Heirs on the issue of title to the disputed property, and denied the Ramirez Heirs' partial summary judgment motion on title. Further, the court properly granted the Lasater/Scott Heirs' no-evidence summary judgment motion on the claims of fraud, breach of fiduciary, and misapplication of fiduciary property. Because our resolution of these issues is dispositive of the appeal, we need not address the other appellate issues raised by the Ramirez Heirs. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996) (appellate court must review all summary judgment grounds on which trial court ruled, whether granted or denied, which are dispositive of the appeal). Accordingly, the trial court's judgment is affirmed.

Phylis J. Speedlin, Justice